**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

MICHAEL J. MEIGHAN,

               Plaintiff,

vs.

TRANSGUARD INSURANCE
COMPANY OF AMERICA, INC.,

               Defendant.

No. C13-3024-MWB

**ORDER**

---

*TABLE OF CONTENTS*

I.     **INTRODUCTION**........................................................................ 2

II.    **BACKGROUND**......................................................................... 2

III.   **THE CURRENT DISPUTE**........................................................ 5
     A.    *Work Product Privilege*............................................. 5
         1.    *Legal Standards* ............................................. 5
         2.    *Analysis* ......................................................... 9
              a.    *Claim Reserves Information* ................................... 14
              b.    *Communications Related to Mediation or Settlement*..... 16
              c.    *Communications Related to Investigation and Coverage* ......................................................... 17
     B.    *Attorney Client Privilege* .......................................... 19
         1.    *Legal Standards* .......................................... 19
         2.    *Analysis* ....................................................... 20

IV.   *CONCLUSION* ......................................................................... 23

# I. INTRODUCTION

This case is before me on plaintiff Michael J. Meighan's motion (Doc. No. 29) to compel responses to discovery. Defendant TransGuard Insurance Company of America, Inc. (TransGuard) filed a resistance on January 10, 2014, to which it attached supplemental responses to interrogatories. Doc. No. 32-1. I then scheduled a telephonic hearing, which was continued after a change in Meighan's counsel. Doc. Nos. 35-37. TransGuard filed a supplemental resistance on February 17, 2014, clarifying the remaining issues in dispute. Doc. No. 38. At the telephonic hearing on February 18, 2014, the parties agreed that the dispute had been narrowed to Parts 1 and 4 of TransGuard's supplemental privilege log (Doc. No. 38-2) in which TransGuard asserts work product and attorney-client privilege as to two categories of documents: (1) claims adjuster notes which include claim reserve information and communications with TransGuard's attorneys and (2) correspondence between attorney Charles Sutton, Jr. (TransGuard's outside counsel), and employees of TransGuard and its legal counsel, as well as corresponding summaries in the claims notes. Meighan's new counsel then requested the opportunity to submit additional written arguments and I entered an order scheduling supplemental briefing. Doc. No. 41. Meighan filed his supplemental brief on February 28, 2014. TransGuard filed a response on March 10, 2014, and Meighan filed a reply on March 20, 2014. The motion is now fully submitted.

# II. BACKGROUND

Meighan filed this diversity action on May 10, 2013, against TransGuard and TransGuard General Agency, Inc. (TGA).[1] Doc. No. 2. He alleges breach of contract and bad faith denials of occupational injury insurance coverage relating to an injury he suffered while working as an independent contractor driving semi-tractor-trailers. *Id.* Meighan later amended his complaint and added a claim of intentional infliction of

---

[1] All claims against TGA have been dismissed. Doc. No. 18.

emotional distress. Doc. No. 8. A second amended complaint was also filed, which deleted references to TGA and attached the policy and other documents. Doc. No. 23.

Meighan's supplemental brief in support of his motion to compel includes the following helpful timeline of events:

| | |
|---|---|
| 08-01-11 | Meighan sustains an injury while "under dispatch"; a covered injury under the applicable policy. |
| 10-28-11 | Meighan files a claim for benefits with TransGuard. |
| 12-15-11 | TransGuard issues its first check covering the period November 30, 2011 to December 19, 2011. |
| 02-13-12 | TransGuard terminates payment of benefits. |
| 02-22-12 | Adjuster Patricia Sobus sends letter to Meighan stating that benefits are stopped because she had not received updated medical records. |
| 03-06-12 | Attorney Jackie Armstrong calls adjuster Sobus regarding social security and benefits. |
| 03-08-12 | Attorney Armstrong sends letter of representation to adjuster Sobus. Armstrong states: "I represent Mr. Meighan in connection with his application for Social Security Disability benefits. Mr. Meighan has also asked me to contact you for clarification for why his disability checks have stopped." |
| 03-12-12 | Adjuster Sobus makes an offer to settle in the amount of $23,000 directly with Meighan. |
| 03-12-12 | Attorney Charles Sutton of Sutton, Alker &Rather, L.LC. becomes involved in the handling of the claim. |

| | |
|---|---|
| 04-25-12 | TransGuard resumes payment of benefits to Meighan. |
| 06-05-12 | Neurosurgeon David Beck, M.D. diagnoses Meighan's condition as spinal stenosis and arthritis not solely attributable to the 08-01-11 injury. |
| 06-09-12 | TransGuard stops payment of benefits to Meighan. |
| 07-10-12 | Attorney Sutton sends denial letter to attorney Armstrong. |
| 10-10-12 | Dr. Beck clarifies his opinion that Meighan had no history of chronic back pain with radicular symptoms and the dominant cause of his low back pain is the fall on 08-01-11 and the impact of pre-existing arthritis is speculative given that degenerative disc disease is common in a 56 year old. |
| 02-22-13 | A mediation is held between the parties. Attorney Armstrong appears on behalf of Meighan and attorney Sutton on behalf of TransGuard. |
| 05-10-13 | Complaint filed. |

Doc. No. 42 at 1-2.

Armstrong was Meighan's counsel of record in this case until January 22, 2014, when she withdrew from representation. Doc. No. 35. Meighan's current counsel filed his appearance on January 21, 2014. Doc. No. 34. Since Meighan's motion was filed, TransGuard has produced its entire claims file from October 28, 2011, through March 9, 2012. Doc. No. 38-3. It has also produced the remainder of the claims file from March 12, 2012, through May 22, 2013, with significant redactions. Doc. No. 38-4. TransGuard contends the redacted information relates to settlement authority, claim

reserves and correspondence between TransGuard employees and between TransGuard and its attorney. TransGuard has submitted a supplemental privilege log with brief descriptions of the documents withheld and the asserted privilege. Doc. No. 38-2.

## III.    THE CURRENT DISPUTE

As stated above, the issues in Meighan's motion to compel have been narrowed to Parts 1 and 4 of TransGuard's supplemental privilege log concerning two categories of documents: (1) claims adjuster notes which include claim reserve information and communications with TransGuard's attorneys and (2) correspondence between Sutton and employees of TransGuard and its legal counsel, as well as corresponding summaries in the claims notes. Meighan requests an order compelling TransGuard to produce the unredacted claims file for March 9, 2012, through May 14, 2013, along with all documents identified in Parts 1 and 4 of the supplemental privilege log without redactions.

TransGuard argues any documents after March 9, 2012, fall under the work product and/or attorney client privilege. Meighan contends these privileges do not apply because Sutton's work consisted of investigating and adjusting the claim rather than giving legal advice, which is not covered by either privilege.

### A.    Work Product Privilege

#### 1.    Legal Standards

The work product privilege is governed by Federal Rule of Civil Procedure 26(b)(3). This rule states:

> (A) *Documents and Tangible Things*. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

> (i)      they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii)     the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3)(A). Even if the court orders discovery of these materials, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

There are two types of work product: ordinary work product and opinion work product. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). The Eighth Circuit Court of Appeals has explained the difference as follows:

> Ordinary work product includes raw factual information. *See Gundacker v. Unisys Corp.,* 151 F.3d 842, 848 n. 4 (8th Cir. 1998). Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories. *See id.* at n. 5. Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means. *See* Fed. R. Civ. P. 26(b)(3). In contrast, opinion work product enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud. *See In re Murphy,* 560 F.2d 326, 336 (8th Cir. 1977).

*Id.* The work product privilege is intended to protect from disclosure materials prepared in anticipation of litigation. *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997). The Eighth Circuit has set forth the following standard for determining whether documents were prepared in anticipation of litigation:

> [T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained

because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

*Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (citing 8 C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure, § 2024, at 198-99 (1970) (footnotes omitted)).  In another case, the Eighth Circuit explained:

Documents "prepared in anticipation of litigation" may include business records that were specifically selected and compiled by the other party or its representative in preparation for litigation and that the mere acknowledgment of their selection would reveal mental impressions concerning the potential litigation. *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1329 (8th Cir. 1986). Documents are not protected under the work product doctrine, however, merely because the other party transferred them to their attorney, litigation department, or insurer. *Id.* at 1328. Nor are documents protected that were assembled in the ordinary course of business or for other nonlitigation purposes. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (citation omitted).

*Peterson v. Douglas Cnty. Bank & Trust Co.*, 967 F.2d 1186, 1189 (8th Cir. 1992). "The inchoate possibility, or even the likely chance of litigation, does not give rise to the privilege." *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986).

The work product privilege is frequently litigated in the context of insurance claims files "because an insurer's business is to investigate claims that may or may not result in litigation." *St. Paul Reins. Co. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 630 (N.D. Iowa 2000) (quoting *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 535 (S.D. Ind. 1999)).  In *Mission Nat'l Ins. Co.*, the court considered the scope of the work product privilege where a law firm was hired to investigate an insurance claim and where the insured alleged bad faith.  112 F.R.D. at 161.  The law firm was

hired as a matter of course based on the geographic area and the amount of the claim. After *in camera* review of the documents, the court concluded most of the documents constituted "pure factual investigation of the claim." *Id.* at 164. It reasoned that because the documents included "non-legal opinions and thoughts about the facts, as opposed to legal or trial matters, such 'mental processes' are properly treated as part of the ordinary business of the insurer" and were therefore discoverable. *Id.*; *see also St. Paul Reins. Co.*, 197 F.R.D. at 636 (noting that the insurer's investigation of whether coverage exists is in the ordinary course of business for an insurance company and is not performed in anticipation of litigation).

To the extent that factual investigation and trial preparation overlap in the investigation, the work product doctrine applies. *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 168 F.R.D. 641 (D. Minn. 1996) ("Where the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach."). The court should then evaluate whether the insured has demonstrated a "substantial need" for the information and "undue hardship" to obtain those materials. *Mission Nat'l Ins. Co.*, 112 F.R.D. at 164. In *Mission Nat'l Ins. Co.*, the court found defendant had established a substantial need given that it needed to know what the insurer knew at the time of the claim denial to prove its defense and counterclaim. *Id.* The court reasoned:

> The issue being the state of the insurer's knowledge, it becomes apparent that plaintiff has all the relevant information under its control. For this compelling reason, then, the claim of work-product is overcome. Even if plaintiff were more persuasive in urging that defendant could determine from other sources what its insurer "should have known" at the time of the claim denial, there is a sufficient basis to conclude that defendant does not have ready access to much of the primary source information. To recreate the arson investigation at this point would clearly constitute undue hardship. Such reasons are adequate for overruling an assertion of the work-product doctrine.

*Id.* (citations omitted). Even though the court found the defendant had proved a substantial need, it still ordered that sections of the submitted documents be redacted which reflected the mental processes and opinions of counsel that related to the anticipated litigation. *Id.*

### 2.    Analysis

Keeping these principles in mind, the critical issue is whether, and if so, when, TransGuard's materials were prepared in anticipation of litigation rather than in the ordinary course of business. TransGuard argues all documents are privileged after March 9, 2012. It contends the routine investigation of Meighan's claim took place from October 28, 2011, through February 2012, when his benefits were terminated because TransGuard had not received updated medical records. It also points out that all of Meighan's allegations of bad faith involve events prior to March 2012 with one exception.[2]

On March 8, 2012, Armstrong contacted TransGuard to ask why Meighan's benefits had been terminated. Doc. No. 38-3 at 1. She stated she represented Meighan in his application for Social Security benefits and he had asked her to contact TransGuard to clarify why his disability checks had stopped.[3] *Id.* On March 9, 2012, claims adjuster

---

[2] That exception is noted in plaintiff's supplemental brief, in which Meighan alleges that TransGuard's refusal to reinstate benefits after receiving a doctor's report on October 10, 2012, is "additional evidence of bad faith." Doc. No. 42 at 8. Meighan alleges in his reply that TransGuard has known about this allegation since it served an expert witness disclosure on December 27, 2013. Doc. No. 44 at 7. That expert witness based his opinion, in part, on TransGuard's actions regarding the October 10th report. *See* Doc. No. 44-1. In any event, TransGuard correctly points out this allegation is not a part of plaintiff's second amended complaint. *See* Doc. No. 25 at 3-4 and 6-9.

[3] According to TransGuard's claim file, Armstrong also wrote an email dated March 7, 2012, in which she provided and requested similar information, but TransGuard did not receive this email until March 12. Doc. No. 38-4 at 66.

Sobus made a note documenting settlement authority. Doc. No. 38-2 at 1. The following Monday (March 12), Sobus contacted Meighan by phone and offered to settle his claim. Doc. No. 38-4 at 67. Immediately after that phone call, Sobus contacted Charles Sutton for assistance with "handling the file" and he accepted the assignment "for legal assistance" on that date. Doc. Nos. 38-2 at 1, 6; 38-4 at 66-67. On March 13, 2012, TransGuard received a letter from Armstrong stating, "Since March 7th you have known that I represent Mr. Meighan in connection with his concerns about your abrupt cessation of his disability checks. I am, therefore, quite disappointed that you directly contacted Mr. Meighan by telephone to entice him to forfeit his contractual entitlement to insurance coverage." Doc. No. 32-3. She also stated, "Please review with your supervisor the bad faith laws in the State of Iowa and the extraordinary exposure for your company, if you persist with your aggressive and unsubstantiated denial of his benefits." *Id.* All future communications were between Sutton and Armstrong.

Meighan contends the nature of the communications between Sutton and Armstrong indicates Sutton was assisting with the adjustment of the claim rather than providing legal advice to TransGuard in anticipation of litigation. Doc. No. 42-1. The communications between Sutton and Armstrong show they exchanged information regarding medical records and social security offsets and continued to discuss a "lump-sum settlement." *Id.* Meighan alleges Sutton essentially stepped into Sobus's shoes and "either directly, or in a supervisory capacity, was investigating and adjusting the file." Doc. No. 42 at 8.

On April 2, 2012, Sutton wrote Armstrong and asked if she was now representing Meighan in all aspects of his occupational accident injury. Doc. No. 42-1 at 2. He informed her that TransGuard could not reinstate Meighan's temporary total disability (TTD) benefits because it did not have updated medical records concerning his injury. He noted that collecting the medical records would likely take several weeks, and offered a full and final settlement of $23,741, plus Armstrong's attorney fees. *Id.* He then

offered to request Meighan's medical records from all known health care providers as soon as he received a HIPPA authorization signed by Meighan. *Id.* He stated, "It is my expectation that after we have received and reviewed the medical records, both parties (i.e., TransGuard and Mr. Meighan) will be in a position to fully and finally amicably resolve this matter by way of a lump-sum settlement." *Id.*

On April 3, 2012, Armstrong sent both a faxed letter and email to Sutton informing him that Meighan was not able to make medical appointments to obtain updated medical records because he was not able to afford them due to cessation of his weekly TTD benefits. She requested that TransGuard contact the physician's office, authorize and pay for treatment and request any needed updates from the physician. *Id.* at 4-5. She then added:

> In order to try to protect your client from the punitive damage and liability of a bad faith suit, please provide express authorization for medical treatment for Mr. Meighan's back pain and promptly resume weekly benefits with interest.
>
> If you decide not to re-start benefits promptly, please provide the name and address of your Iowa counsel for litigation.
>
> Your client's attempt to contact my client directly to settle his case after your client was advised that Mr. Meighan had legal representation will support a bad faith petition, along with your client's cessation of benefits without a reasonable basis. While I initially shared your optimism that this grave error might be mitigated by a prompt resumption of benefits, your client's continued delay implies further bad faith – that a large insurance carrier is relying on an injured truck driver's pain, distress and lack of financial security to manipulate a modest settlement and avoid contractual responsibilities. Please restart the benefits.

*Id.* at 5. Sutton replied indicating he would forward the request for authorization of treatment to TransGuard. *Id.* at 6. He stated he disagreed with the assertions of bad

faith and that all of TransGuard's actions had been consistent with the terms of the policy. *Id.*

On April 9, 2012, Sutton indicated TransGuard had authorized Meighan to be treated by the recommended physician, Dr. Ledet. He also updated Armstrong on the requests for medical records he had made and what he had received. *Id.* at 8. The two attorneys continued to exchange medical reports as they came in, including one from Dr. Ledet after Meighan's appointment. *Id.* at 11. Upon receipt of Dr. Ledet's report, Sutton sent a letter to Dr. Ledet with three follow-up questions and also forwarded the letter to Armstrong. Armstrong responded the next day asking why Meighan's benefits had not been reinstated and told Sutton she was advising Meighan to file suit the following week. *Id.* at 19. Sutton replied five days later forwarding Dr. Ledet's responses to the letter and additional medical records. He indicated he had forwarded Armstrong's previous email to TransGuard and would get back to her shortly. *Id.* at 21. Armstrong wrote back and stated she was drafting the petition for bad faith and planning to file it the next day. *Id.*

Before the petition was filed, Sutton and Armstrong reached an agreement. They agreed that TransGuard would bring Meighan current as to past TTD benefits and would reinstate his weekly TTD benefits and Meighan would refrain from filing a lawsuit. They also agreed to discuss a lump-sum settlement in the near future. *Id.* at 22. Meighan saw Dr. Beck, a neurosurgeon, in May 2012 as recommended by Dr. Ledet. *Id.* at 28. Armstrong forwarded Dr. Beck's report to Sutton on May 25. *Id.* at 30.

On June 16, 2012, Meighan was awarded social security disability benefits with April 2012 being his first month of entitlement. *Id.* at 33. The parties discussed TransGuard's offset provision and Sutton also requested a settlement demand from Meighan. *Id.* at 36. TransGuard discontinued Meighan's benefits on July 10, 2012, partly due to Dr. Beck's opinion that Meighan's accident on August 1, 2011, exacerbated his pre-existing L4-5 hypertrophy and degeneration. Doc. No. 42-3. On October 10,

2012, Dr. Beck retracted his opinion because there was no x-ray or MRI documenting a pre-existing degenerative disc condition. Doc. No. 42-4. TransGuard and Meighan mediated in February 2013, which was unsuccessful.

I find that litigation was reasonably foreseeable on March 13, 2012, when Armstrong first accused TransGuard of acting in bad faith. However, that is not to say that all documents created after that date are privileged, as some may reflect work performed in the ordinary course of business, not in anticipation of litigation. *See St. Paul Reins. Co.*, 197 F.R.D. at 636. I have reviewed Parts 1 and 4 of TransGuard's supplemental privilege log, which describe the following documents that have been withheld solely under a claim of work product privilege:

> **A.     March 9, 2012**. Claim adjuster note documenting settlement authority. (Work product privilege)
>
> **B.     May 3, 2012.** Correspondence between TransGuard employees Patricia Sobus and George Darnell regarding possible surveillance of Michael Meighan. (Work product privilege).
>
> **C.     May 15, 2012**. Communications between TransGuard employees Patricia Sobus and George Darnell regarding surveillance. (Work product privilege).
>
> **D.     November 12, 2012.** Patricia Sobus notation in claims notes regarding reserves amount. (Work product privilege).
>
> **E.     November 12, 2012.** Claims note entry regarding discussion between TransGuard employees Patricia Sobus and her manager, Christy Skallus regarding mediation. (Work product privilege).
>
> **F.     November 16, 2012.** Patricia Sobus entry in claims notes regarding plan of action as to mediation. (Work product privilege).

**G. December 10, 2012.** Patricia Sobus entry in claims notes regarding discussion between TransGuard employees Patricia Sobus, Christy Skallus, and Mike Keeling regarding mediation. (Work product privilege).

**H. January 22, 2013.** Correspondence between TransGuard employees Patricia Sobus, Christy Skallus, and Dave Logan regarding Markel policy (Markel policy provides non-occupational accident coverage; TransGuard policy is occupational accident coverage). (Work product privilege).

**I. January 24, 2013.** Correspondence between TransGuard employees Patricia Sobus, Christy Skallus, and Dave Logan regarding discussion with attorney Sutton about Markel's non-occupational accident policy. (Work product privilege).

**J. February 28, 2013.** Claim note regarding claim reserve update. (Work product privilege).

Doc. No. 38-2 at 1-5. I will refer to these documents by the assigned letter, as shown above, throughout the remainder of this order. They fall into three categories: (1) claim reserves information (Documents D and J), (2) communications related to mediation or settlement (Documents A, E, F and G) and (3) communications regarding investigation and coverage (Documents B, C, H and I). I will address each category separately.

### a. Claim Reserves Information

"Reserves are an insurer's estimates of potential losses due to claims on its policies." *Burke v. Ability Ins. Co.*, 291 F.R.D. 343, 349 (D.S.D. 2013) (quoting *Spirco Envt'l Inc. v. Am. Int'l Specialty Lines Ins. Co.*, Civ. No. 05-1437, 2006 WL 2521618, at *1 (E.D. Mo. Aug. 30, 2006)). "Evidence related to reserves is generally relevant because '[t]he failure of an insurer to offer a reasonable amount to settle a claim, on a claim of bad faith breach of duty, might be evidenced by the insurer's setting aside a substantially great amount of reserve for that claim.'" *Id.* Many courts have found an

insurer's reserve information is privileged. *See, e.g., Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, No. 1:03CV1322, 2006 WL 355289, at *2 (N.D. Ohio Feb. 15, 2006) ("Where the reserves have been established based on legal input, the results and supporting papers most likely will be work-product and may also reflect attorney-client privileged communications."); *Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 331-34 (N.D. W. Va. 2006) ("all documents concerning loss reserves . . . are protected by the work-product doctrine and are not discoverable").

The Eighth Circuit has distinguished individual or specific case reserves from aggregate reserve information. *See Simon*, 816 F.2d at 401. In *Simon*, the court stated that "[t]he individual case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product." *Id.* (citing *Hickman v. Taylor*, 329 U.S. 495, 512 (1947)). However, it found that aggregate reserve information (used for business-planning purposes) was discoverable as it was not prepared for any particular litigation purpose and did not reveal an attorney's mental impressions. *Id.* at 401-02.

The reserves information here seems to relate to Meighan's particular claim. Although this information was documented by Sobus, who is not an attorney, it is still protected by the work product privilege. *See* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial *by or for* another party or its representative. . . .") (emphasis added). I find that the documents in Part 1 reflecting claim reserves information (Documents D and J) were prepared in anticipation of litigation and are therefore protected by the work product privilege.

### b. *Communications Related to Mediation or Settlement*

I have found that litigation was reasonably anticipated on March 13, 2012, when Armstrong accused TransGuard of acting in bad faith. Part of Armstrong's accusation was related to TransGuard's call to Meighan on March 9, 2012, offering to settle his claim for approximately $23,000. TransGuard requested Sutton's assistance immediately following this call. The only document withheld prior to March 13, 2012, under work product privilege is a claim adjuster note documenting settlement authority on March 9, 2012. I find this note could not have been made in anticipation of litigation and does not otherwise indicate it contains "mental impressions, conclusions, opinions, or legal theories" prohibited under Rule 26(b)(3)(B). Therefore, Document A should be produced without redaction, along with any associated parts of the claims file.

As for the other documents and claims notes related to mediation or settlement, I find these documents are properly protected under the work product privilege as they were prepared in anticipation of litigation (or avoiding such litigation) after March 13, 2012. Under Rule 26(b)(3), the work product privilege can be overcome if: (a) the documents are otherwise discoverable under Rule 26(b)(1) and (b) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. Fed. R. Civ. P. 26(b)(3). I find that Meighan cannot meet these criteria.

Information is discoverable under Rule 26(b)(1) if it "is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1). The Rule also states that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Meighan generally argues the evidence he needs to prove his bad faith claim is likely found in the claims file and documents contained in Parts 1 and 4 of TransGuard's supplemental privilege log. He states that because this is a bad faith case, he needs evidence of "when the insurer made the connection between certain facts and its determination to deny 'coverage' on some purportedly 'reasonable basis.'" Doc. No. 42 at 9 (citing *St. Paul Reins. Co.*, 197 F.R.D. at 638-39). He makes no argument that the documents at issue are necessary to prove any of his other claims.

I find that Meighan has not demonstrated that the mediation and settlement documents at issue are otherwise discoverable under Rule 26(b)(1) because they are not relevant to his bad faith claim. According to his second amended complaint, Meighan alleges that TransGuard had no reasonable basis and knew or had reason to know it had no reasonable basis to stop payment of benefits on February 13, 2012. Doc. No. 25 at 8. He also alleges TransGuard did not have a reasonable basis for denying payment of benefits on February 22, 2012. *Id.* Meighan's complaint contains no allegations of wrongdoing past February 2012 for his bad faith claim. Because the documents at issue are dated November 12, 2012 through December 10, 2012, they are not relevant to Meighan's bad faith claim under Rule 26(b)(1) and remain protected under the work product privilege. In the alternative, I find that Meighan cannot demonstrate a substantial need or undue hardship in obtaining these documents as they appear to be irrelevant to his bad faith claim. For these reasons, Documents E, F and G are protected by the work product privilege and need not be disclosed.

### c.    *Communications Related to Investigation and Coverage*

As noted above, "courts have routinely recognized that the investigation and evaluation of claims is part of the regular, ordinary, and principal business of insurance companies." *Goodyear Tire & Rubber Co.*, 190 F.R.D. at 535. Even if the parties reasonably anticipate litigation, the work product privilege does not apply to documents

that are generated in the ordinary course of business. *See St. Paul Reins. Co.*, 197 F.R.D. at 636-38.

I find that the documents related to surveillance of Meighan constitute "pure factual investigation of the claim" rather than documents that were prepared in anticipation of litigation. *See Mission Nat'l Ins. Co.*, 112 F.R.D. at 164 (noting that documents related to the issue of how a fire started and who was responsible for it contained non-legal opinions and thoughts about the facts, which were generated in the routine business of an insurance company). Presumably, TransGuard wanted to obtain surveillance of Meighan to determine if his injury was as disabling as he claimed to determine whether he was entitled to TTD benefits under the policy or not. Nothing indicates the TransGuard employees were discussing surveillance as part of a litigation strategy or under Sutton's direction. Although I have found TransGuard could have anticipated litigation as of March 13, 2012, these surveillance communications arise from the investigation and adjustment of Meighan's claim. Indeed, communications between Sutton and Armstrong during the time these documents were created indicate that TransGuard had recently agreed to pay past TTD benefits and reinstate Meighan's TTD benefits if he would refrain from filing a lawsuit. Doc. No. 42-1 at 22. An appointment with a neurosurgeon had also been scheduled to obtain a recent physician's statement. Doc. No. 42-1 at 25. Surveillance was part of TransGuard's additional investigation. For these reasons, I find that Documents B and C are not protected by the work product privilege and must be produced without redaction, along with any associated parts of the claims file.

As for documents containing correspondence between TransGuard employees and TransGuard employees and Sutton about the Markel policy, or non-occupational accident policy, I find these documents should also be produced. These documents appear to relate to adjustment of the claim and the issue of which policy (if either) provides coverage for Meighan's injury. This involves factual investigation and non-legal work

that is routine in the insurance industry. Therefore, I find that Documents H and I are not protected by the work product privilege and must be produced without redaction, along with any associated parts of the claims file.

## B.    *Attorney Client Privilege*

TransGuard has asserted the attorney client privilege for the rest of the documents in Parts 1 and 4 of its supplemental privilege log and redacted portions of the claims file from March 12, 2012 through May 22, 2013. TransGuard contends these documents reflect confidential communications between TransGuard employees and Sutton.

### 1.    *Legal Standards*

The scope of attorney client privilege is determined by state law in a diversity action. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This privilege is codified in Iowa law as follows:

> A practicing attorney . . . who obtains information by reason of the person's employment . . . shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.

Iowa Code § 622.10. "Any confidential communication between an attorney and the attorney's client is absolutely privileged from disclosure against the will of the client." *Keefe v. Bernard*, 774 N.W.2d 663, 669 (Iowa 2009) (quoting *Shook v. City of Davenport*, 497 N.W.2d 883, 885 (Iowa 1993), *overruled on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 43 (Iowa 2004)). The attorney client privilege focuses on the nature of the relationship involved and is "not dependent whatsoever upon the anticipation of litigation." *Mission Nat'l Inc. Co.*, 112 F.R.D. at 163.

For a communication to be privileged, "the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity." *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1978) (rehearing en banc). "A communication is not privileged simply because it is made by or to a person who happens to be a lawyer." *Id.* (citing 8 Wright & Miller, op. cit. p. 136). "It is clear that the attorney must be acting in the role of legal counsel with respect to the information in issue before the privilege may attach." *Mission Nat. Ins. Co.*, 112 F.R.D. at 163.

### 2.     *Analysis*

The issue here is whether Sutton was acting as legal counsel or a claims adjuster and whether the communications between TransGuard employees and Sutton reflect legal advice or business advice. Meighan argues that Sutton essentially stepped into the shoes of Sobus and engaged in the non-legal work of investigating, valuing and adjusting the claim. TransGuard argues that it hired Sutton in response to Armstrong's accusations of bad faith (*see* Doc. No. 43 at 12 n.1), suggesting that he was hired to provide legal advice. TransGuard's own claims file indicates it reached out to Sutton the day before Armstrong made the accusations of bad faith. It is unclear why TransGuard hired Sutton when it did, but in any event, TransGuard almost immediately required his legal assistance after he was hired. Armstrong indicated that she represented Meighan (on his Social Security claim) when she called TransGuard on March 8, 2012. Five days later, she accused TransGuard of acting in bad faith by offering to settle with Meighan and alleged that it had known since March 7, 2012, that she represented Meighan with regard to his insurance claim. Doc. No. 32-3. Armstrong's early involvement and accusations of bad faith support a finding that TransGuard hired Sutton for legal advice related to Meighan's claim rather than some other business purpose.

Meighan concedes in his reply that the attorney client privilege "might attach to documents or correspondence reflecting Sutton's legal advice and opinions to TransGuard about the bad faith tort claim." Doc. No. 44 at 3. He also does not disagree with the general proposition cited by TransGuard that retaining legal counsel "to interpret the policy, investigate the details surrounding the damage, and to determine whether the insurance company is bound for all or some of the damage, is a 'classic example of a client seeking legal advice from an attorney.'" *Hartford Fin. Servs. Grp., Inc. v. Lake Cnty. Park and Rec. Bd.*, 717 N.E.2d 1232, 1236 (Ind. Ct. App. 1999). However, he argues the attorney client privilege does not attach to documents or correspondence where Sutton was "investigating, adjusting, setting reserves, or giving advice to TransGuard employees about how to conduct those activities." *Id.* He also contends that the adversarial relationship between TransGuard and Meighan after March 9, 2012, is not relevant to the issue of attorney client privilege.

I find that TransGuard and Sutton established an attorney client relationship on March 12, 2012, when Sutton accepted TransGuard's request for legal assistance. I recognize that many of the communications between Sutton and TransGuard related to the investigation of Meighan's claim. Sutton and Sobus discussed medical reports, arranged for treatment paid by TransGuard and discussed the policy provisions and settlement. Doc. No. 38-2 at 6-14. However, in light of Armstrong's early involvement and bad faith accusations, I find that Sutton's communications with TransGuard employees and legal counsel involved more than just business advice. Even if Sutton was advising TransGuard on some ordinary business matters, his advice surely reflected consideration of Meighan's bad faith allegations and his professional judgment as to how TransGuard should continue handling the claim to avoid litigation. In other words, the adversarial relationship between the parties is relevant in this case because it reflects the type of advice Sutton provided. If there had been no allegation of bad faith while Sutton was simply assisting with the investigation and adjustment of the claim, I would be more inclined to find that Sutton was only providing ordinary business advice. Indeed, the

adversarial relationship is what distinguishes this case from *Mission Nat'l Ins. Co.* In that case, a law firm was hired as a matter of course to conduct the claim investigation as soon as the claim was made. 112 F.R.D. at 162-63. Here, TransGuard conducted the initial investigation on its own from October 2011 to February 2012 and only contacted Sutton after Meighan's counsel became involved.

Moreover, the documents and correspondence between TransGuard and Sutton clearly fall within the scope of actions described in *Hartford Financial Services Group, Inc.* I fail to see any difference between the type of work reflected in the documents at issue in that case and the ones at issue here. In *Hartford*, the disputed documents were generated between the date of the reported loss and the date the complaint was filed alleging bad faith. 717 N.E.2d at 1234. They contained correspondence between the insurer and its outside counsel as well as internal communications regarding the advice or opinions of counsel with respect to the loss. *Id.* The court found the documents were protected under attorney client privilege and relied, in part, on the reasoning of a California appeals court which stated:

> [C]onsultations regarding a policy of insurance between an insurance company and its attorney prior to the time the insurance company has accepted its obligations under that policy are protected by the attorney-client privilege vis a vis the person insured by the policy. Such a rule makes perfect sense, as an insurance company should be free to seek legal advice in cases where coverage is unclear without fearing that the communications necessary to obtain that advice will later become available to an insured who is dissatisfied with a decision to deny coverage. A contrary rule would have a chilling effect on an insurance company's decision to seek legal advice regarding close coverage questions, and would disserve the primary purpose of the attorney-client privilege— to facilitate the uninhibited flow of information between a lawyer and client so as to lead to an accurate ascertainment and enforcement of rights.....

*Id.* at 1235-36 (quoting *Aetna Cas. & Surety Co. v. Superior Court*, 143 Cal.App.3d 467, 474 (Cal. Ct. App. 1984)). I agree with this reasoning in the context of this case, especially in light of the fact that Armstrong accused TransGuard of acting in bad faith almost immediately after Sutton was retained. Certainly any additional investigation or actions performed by TransGuard on Meighan's claim was guided by the legal advice of its counsel. For these reasons, I find that all documents asserting attorney client privilege as of March 12, 2012, in Parts 1 and 4 of TransGuard's supplemental privilege log and its claims file should remain privileged.

## IV.    CONCLUSION

To summarize, Meighan's motion (Doc. No. 29) to compel response to discovery is **granted in part and denied in part.** It is **granted** as to the following documents and associated parts of the claims file:

> **A.    March 9, 2012**. Claim adjuster note documenting settlement authority.
>
> **B.    May 3, 2012.** Correspondence between TransGuard employees Patricia Sobus and George Darnell regarding possible surveillance of Michael Meighan.
>
> **C.    May 15, 2012**. Communications between TransGuard employees Patricia Sobus and George Darnell regarding surveillance.
>
> **H.    January 22, 2013.** Correspondence between TransGuard employees Patricia Sobus, Christy Skallus, and Dave Logan regarding Markel policy.
>
> **I.    January 24, 2013.** Correspondence between TransGuard employees Patricia Sobus, Christy Skallus, and Dave Logan regarding discussion with attorney Sutton about Markel's non-occupational accident policy.

TransGuard must produce these documents and the associated parts of the claims file to Meighan, without redaction, on or before **April 11, 2014**.

Meighan's motion is **denied** as to all other documents and associated parts of the claims file.

**IT IS SO ORDERED.**

**DATED** this 24th day of March, 2014.

_____

LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE